# In the United States Court of Federal Claims

No. 21-1190
(Filed:  12 August 2022)

*****************************************

| | | |
|---|---|---|
| ITSERVE ALLIANCE, INC., *et al.*, | * | |
| | * | |
| Plaintiffs, | * | Statutory Interpretation; Chevron Deference; |
| | * | Plain Meaning; Illegal Exaction; Motion for |
| v. | * | Summary Judgment; Fraud Fee; |
| | * | Immigration and Naturalization Act; |
| THE UNITED STATES, | * | United States Citizenship and Immigration |
| | * | Services. |
| Defendant. | * | |
| | * | |

*****************************************

*Geoffrey Forney*, with whom were *Jonathan Wasden*, and *Bradley B. Banias*, Wasden Banias LLC, all of Philadelphia, PA, for plaintiffs.

*Elizabeth M. Hosford*, Assistant Director, with whom were *Vincent D. Phillips, Jr.*, Senior Trial Counsel, *Brian M. Boynton*, Acting Assistant Attorney General, and *Patrick M. McCarthy*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE**, Judge.

Plaintiffs are entities employing over 50 employees with over half comprising nonimmigrant workers in H-1B or L-1 status ("50/50 employers").  Plaintiffs seek a refund of visa fees they allege were illegally exacted in connection with petitions to change the status to H-1B nonimmigrant classification for their foreign national employees already admitted and physically present in the United States in another nonimmigrant status.  Plaintiffs argue Congress intended the agency charge 50/50 employers increased fees only when their H-1B employees seek physical admission to the United States at a port of entry, not when 50/50 employers only seek to change an employee's status.  The government argues the increased fee applies whenever the Fraud Fee is otherwise required with petitions for H-1B status.  This issue is one of direct statutory interpretation and requires the Court to consider the plain meaning, context, and statutory structure of Pub. L. No. 111-230 (2010) and Pub. L. No. 114-113 (2015).  Recent statutory interpretation cases, including the Supreme Court's decisions in *West Virginia v. EPA*, *American Hospital Ass'n v. Becerra*, and *Becerra v. Empire Health Foundation*, act as guideposts for the Court.  For the following reasons, the Court grants the government's cross-motion for summary judgment.

## I. Background

### A.  Factual History

The government states, "[t]he only facts that are relevant to the issue of liability in this case . . . are the statute itself, and any regulations promulgated or documents created by [the United States Citizenship and Immigration Services ("USCIS")] related to the agency's implementation of the increased fee."  Def.'s Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Cross-MSJ") at 13, ECF No. 45.  At oral argument, plaintiffs agreed there is "no disputed issue of material fact" as to the issue of whether the statutes require plaintiffs pay the increased visa fees.  For the question of whether the statutes require plaintiffs pay the increased fees, there is no material dispute of fact and the Court need only consider the statute and related agency USCIS regulations.

### B.  Statutory Background

As codified in Title 8 of the United States Code, the Immigration and Nationality Act ("INA") is the statutory source of the United States' lawful immigration system.  *See generally* 8 U.S.C. §§ 1101-07; 1151-1382; 1401-1504; 1521-25; 1531-37.  This case involves one category of nonimmigrants who are temporarily in the United States to perform skilled services in qualified specialty occupations for United States employers under an "H-1B" classification status.  *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).  Under the H-1B program, Congress imposed a short deadline for the Department of Labor to approve Labor Condition Applications filed by employers as the first of two steps to sponsor H-1B workers.  *See* 8 U.S.C. § 1182(n)(1).  This short deadline expedites employers' access to skilled H-1B workers.  After the Department of Labor approves the Labor Condition Application, employers file a petition with USCIS, using Form I-129, to classify a foreign worker as an H-1B nonimmigrant.  *See* 6 U.S.C. § 271(b)(5); 8 U.S.C. § 1184(c)(1); 8 C.F.R. § 214.2(h)(1)(i), (2)(i)(A); 8 C.F.R. § 103.2(a).  Employers bear the burden of establishing the nonimmigrant has the necessary qualifications when seeking H-1B status for nonimmigrants.  *See* 8 U.S.C. § 1361.

In addition to filing the petition, employers must pay all requisite fees.  8 C.F.R. § 103.2(a)(1) ("Each form, benefit request, or other document must be filed with the fee(s) required by regulation.").  Employers must pay a base filing fee, and employers must pay a Fraud Prevention and Detection Fee when:  (i) they file a petition "initially to grant an alien nonimmigrant status" in H-1B classification; or (ii) they seek "to obtain authorization for an alien having such status to change employers."  8 U.S.C. § 1184(c)(12)(A)(i)–(ii), (C); 8 C.F.R. § 103.7(b)(i)(HHH) (2020).

Employers may seek H-1B status for current or prospective foreign national employees who are either outside the United States or who are already physically present in the United States as nonimmigrants.  Foreign nationals outside the United States may use the employer's approved H-1B nonimmigrant petition to apply for a nonimmigrant visa at an overseas United States Consulate.  *See* 8 U.S.C. §§ 1201(a)(1)(B), 1202(c); 22 C.F.R. § 41.53(a)(2), 41.101(a). The foreign national must present the approved nonimmigrant visa to an immigration officer at a port of entry to apply for "admission" to the United States.  *See* 8 U.S.C. §§ 1101(a)(4) (defining "application for admission"), (13)(A) (defining "admission" and "admitted")*, 1225(a)(3); 8

C.F.R. § 235.1(a), (f)(1); *cf. Matter of Walsh & Pollard*, 20 I. & N. Dec. 60, 61 & 64 (B.I.A. 1988) (discussing attempt by foreign nationals to enter the United States using a nonimmigrant visa issued by the consulate). If the foreign national is inspected and authorized by an immigration officer to enter, the foreign national is deemed "admitted" to the United States. *See* 8 U.S.C. § 1101(a)(13)(A); *Matter of Quilantan*, 25 I. & N. Dec. 285, 290–91 (B.I.A. 2010).

Employers may also seek to classify foreign nationals who are already admitted to the United States in another nonimmigrant classification as H-1B nonimmigrants. *See* 8 U.S.C. § 1258(a). Employers may seek to change the status of a foreign national nonimmigrant to H-1B classification from a different nonimmigrant category if the foreign national is already "lawfully admitted to the United States as a nonimmigrant" and has continued to maintain nonimmigrant status. *See id.*; 8 C.F.R. § 248.1(a), (c); *cf. Matter of Safetran*, 20 I. & N. Dec. 49 (Comm'r 1989) (discussing the change of status from L-1 to H-1 by a foreign national already inside the United States).

In 2010, Congress enacted an Act with the following language:

(b) Notwithstanding any other provision of this Act or any other provision of law, during the period beginning on [September 30, 2010] and ending on September 30, 2014, the filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(i)(b)) shall be increased by $2,000 for applicants that employ 50 or more employees in the United States if more than 50 percent of the applicant's employees are such nonimmigrants or nonimmigrants described in section 101(a)(15)(L) of such Act [("50/50 employers")].

Act of Aug. 13, 2010, Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 ("2010 Fee Statute"). Although the increased fee was to sunset on 30 September 2014, on 2 January 2011, President Obama signed the James Zadroga 9/11 Health and Compensation Act of 2010 which extended the sunset date of the 2010 Fee Statute to 30 September 2015. *See* Pub. L. No. 111-347, § 302, 124 Stat. 3623, 3667 (2011).

USCIS implemented the additional fees imposed by the 2010 Fee Statute and "[n]otably, USCIS identified petitions subject to the Fraud Prevention and Detection Fee codified at 8 U.S.C. § 1184(c)(12) as subject to the increased fee." Def.'s Cross-MSJ at 7 (citing App. 032–33, 35). After the enactment of the 2010 Fee Statute, Department of Homeland Security ("DHS") published a regulation requiring all employers subject to the Fraud Prevention and Detection Fee under 8 U.S.C. § 1184(c)(12)(A) to pay the additional fee under the 2010 Fee Statute, even if the employers were only seeking to change the status of the foreign nationals, who were already admitted to the United States, to H-1B classification. *See* 8 C.F.R. § 103.7(b)(1)(i)(EEE), 214.2(h)(19)(i) (2014).

In 2015, Congress increased the enhanced fee to $4,000 for H-1B petitions, set a sunset date of 30 September 2025, added the word "combined" before "filing fee and fraud prevention and detection fee[,]" and clarified the enhanced fee applies to "application[s] for an extension of

[H-1B] status[.]"  Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 402(g), 129 Stat. 2242, 3006 (2015) ("2015 Fee Statute").[1]  The full text of the relevant provision is as follows:

> (b) Temporary H-1b Visa Fee Increase--Notwithstanding section 281 of the Immigration and Nationality Act (8 U.S.C. 1351) or any other provision of law, during the period beginning on the date of the enactment of this section and ending on September 30, 2025, the combined filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(i)(b)), including an application for an extension of such status, shall be increased by $4,000 for applicants that employ 50 or more employees in the United States if more than 50 percent of the applicant's employees are such nonimmigrants or nonimmigrants described in section 101(a)(15)(L) of such Act.

*Id.*  Congress then extended the enhanced fee under the 2015 Fee Statute through 30 September 2027.  *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 30203(a), 132 Stat. 64, 126.  The statutory amendment under the Consolidated Appropriations Act, 2016, also established within the general fund of the Treasury a separate account known as the "9-11 Response and Biometric Exit Account."  2015 Fee Statute.  It further required USCIS to deposit half the money collected under the 2015 Fee Statute into the segregated account.  *Id.*  In 2016, USCIS codified the increased fees by notice and comment rulemaking.  U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 73292, 73331 (Oct. 24, 2016).

Before 3 August 2020 USCIS did not promulgate a regulation explaining what categories of petitions are subject to the enhanced fees under the 2015 Fee Statute.  USCIS, however, provided in the instructions to Form I-129 that petitioners required to submit the $500 Fraud Prevention and Detection fee under 8 U.S.C. § 1184(c)(12)(A) are also required to submit an additional fee of $4,000 under the 2015 Fee Statute when seeking H-1B classification.[2]

### C. Procedural History

On 26 January 2020, plaintiffs filed a complaint in the United States District Court for the District of Columbia, ECF No. 1.  On 30 November 2020, the District Court issued an order denying plaintiffs' motion for partial summary judgment, denying plaintiffs' motion to certify class, and transferring the case to the Court of Federal Claims, ECF No. 24.  On 13 April 2021,

---

[1] Although neither the 2010 Fee Statute nor the 2015 Fee Statute was codified in the United States Code, both parties agree the fee statutes would be codified in Chapter 8 of the United States Code.  *See* Tr. at 41:17–21 (the government agreeing the fee statutes would be within the Title 8), 42:7 (plaintiffs agreeing).  The parties also agree the fee statutes would thus be subject to the Title 8 section 1101 definitions.  *See* Tr. at 41:22–42:1 (the government agreeing the definitions apply), 42:7 (plaintiffs agreeing).

[2] Plaintiffs note "two courts preliminarily enjoined USCIS's [3 August 2020] rule."  Pls.' MSJ Mem. at 22 (citing 86 Fed. Reg. at 7943).  Notably, both lawsuits challenge the USCIS's implementation on procedural grounds and neither opinion mentions H-1B status, "extensions of such status," or the public laws at issue in this case.  *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Nw. Immigrant Rts. Project v. U. S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31 (D.D.C. 2020).

the District Court transferred the case to this court, ECF No. 26, and on 10 May 2021, plaintiffs filed a transfer complaint ("Am. Compl."), ECF No. 30.  In the transfer complaint, plaintiffs "seek[] a declaratory judgment and order compelling the United States to return the fees that [USCIS] unlawfully exacted[.]"  Am. Compl. at 2.  Plaintiffs allege three causes of action and two potential classes:  (1) with Count I for declaratory relief, plaintiffs seek a declaration the government's collection of additional fees is contrary to Public Law Nos. 111-230, 114-113, and 115-123, Am. Compl. at 21–22; (2) with Count II, plaintiffs seek a refund of fees exacted contrary to the 2010 Fee Statute from 1 January 2014 through 17 December 2015 ("Class 1"), Am. Compl. at 10, 22; and (3) with Count III, plaintiffs seek a refund of fees exacted contrary to the 2015 Fee Statute or the Bipartisan Budget Act of 2018 from 18 December 2015 to present ("Class 2"), Am. Compl. at 13, 23.

On 24 September 2021, plaintiffs filed a motion for summary judgment, arguing USCIS violated the unambiguous terms of the statute by exacting enhanced fees from 50/50 employers filing petitions for "change of status" which did not involve an "application for admission."  *See* Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 40; Pls.' Mem. In Supp. of their Mot. for Summ. J. ("Pls.' MSJ Mem."), ECF No. 40.  On 5 November 2021, the government filed a cross-motion for summary judgment and a response to plaintiffs' motion for summary judgment, arguing Congress's intent to apply the enhanced fee to all H-1B petitions subject to the Fraud Fee is revealed when the statute is read as a whole, in context with the overall statutory scheme, and considering the legislative history.  *See* Def.'s Cross-MSJ.  Plaintiffs filed a response to the government's cross-motion and reply in support of their motion for summary judgment on 18 November 2021.  *See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. and Reply in Supp. of their Mot. for Summ. J. ("Pls.' Resp. & Reply"), ECF No. 46.  On 10 December 2021, the government filed its reply in support of its cross-motion for summary judgment.  *See* Def.'s Reply in Supp. of Cross-Mot. for Summ. J. ("Def.'s Reply"), ECF No. 49.  The Court held argument on the parties' cross-motions for summary judgment on 1 April 2022.  *See* Order, ECF No. 50.

## II.  Parties' Arguments

### A.  Plaintiffs' Arguments

"Plaintiffs move for summary judgment on their illegal exaction claims . . . based on [USCIS's] charging additional fees, contrary to statutory authority, for plaintiffs' H-1B change of status petitions filed on behalf of their foreign national employees who were already admitted to and physically present in the United States . . . ."  Pls.' MSJ at 1–2 (citations omitted).  Plaintiffs contend they are entitled to summary judgment by advancing three arguments:  (1) the statutes unambiguously define the universe of petitions subject to additional fees; (2) USCIS's attempt to manufacture ambiguity from silence fails; and (3) plaintiffs' change of status petitions are not covered extensions of status.  *See generally* Pls.' MSJ Mem.  Plaintiffs conclude they "are entitled to judgment as a matter of law" "[b]ased on USCIS's improperly collecting additional fees from plaintiffs under the agency's misapplication of the statute[.]"  Pls.' MSJ Mem. at 11–12.

### B.  The Government's Arguments

The government opposes plaintiffs' motion for summary judgment and moves for summary judgment in its favor by advancing three main arguments: (1) Count I of plaintiffs' complaint must be dismissed for lack of jurisdiction because plaintiffs seek declaratory relief; (2) USCIS is authorized by Public Law Nos. 111-230 and 114-113 to collect increased fees on petitions for H-1B classification filed by 50/50 employers when the fraud fee is required; (3) USCIS has not manufactured ambiguity from silence in its interpretation of the text of Public Law Nos. 111-230 and 114-113 and the agency's interpretation is entitled to deference. *See* Def.'s Cross-MSJ at i–ii. The government argues "[p]laintiffs cannot demonstrate that petitions for change of status for H-1B classification, despite being subject to the Fraud Fee, are excluded from application of the increased fee." *Id.* at 16. The government argues "[a]lthough the plain language of the statutory provision is ambiguous or silent regarding the H-1B petitions to which the fee increase applies, Congress's intent to apply the fee to all H-1B petitions subject to the Fraud Fee is revealed when the statute is read as a whole and in context with the overall statutory scheme." *Id.* at 1–2. "Moreover, Congress implicitly ratified this interpretation through reenactment of the statute five years later." *Id.* at 2. The government urges "the Court should grant summary judgment for the United States, given that USCIS's interpretation gives effect to the entire provision and ensures that Congress's decision to impose this increased fee on employers relying on H-1B nonimmigrant employees is not rendered meaningless." *Id.*

## III.  Applicable Law

Summary judgment is appropriate if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). As statutory interpretation is a question of law, the Court may grant summary judgment if the facts not genuinely disputed on the summary judgment record establish liability under the proper statutory interpretation. *See United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1290 (Fed. Cir. 2014) (affirming the Court of International Trade's grant of summary judgment by holding the president of importer "'introduced' the merchandise into United States commerce by means of the undervaluation within the meaning of 19 U.S.C. § 1592(a)(1)(A)").

Although the Court applies the two-step *Chevron* framework to determine whether the government violated a statute, if the Court determines at "step one" Congress has directly spoken to the question at issue, the Court's inquiry ends. [3] *See Nat'l Ass'n of Mfrs. v. Dep't of Treasury*,

---

[3] While the Court applies *Chevron* in this case, it first notes the Supreme Court may be distancing itself from *Chevron*. *See* David B. Rivkin Jr. & Mark Wendell DeLaquil, *No More Deference to the Administrative State*, THE WALL STREET JOURNAL (10 July 2022) https://www.wsj.com/articles/no-more-deference-to-the-administrative-state-west-virginia-v-epa-chevron-major-questions-john-roberts-regulation-democracy-congress-11657475255?mod=Searchresults_pos1&page=1 ("the Supreme Court may issue a . . . belated death notice for *Chevron v. Natural Resources Defense Council* . . . If so, the beginning of the end will have come on the closing day of this year's term, when the high court decided *West Virginia v. Environmental Protection Agency*."); Prof. Hugh Hewitt, *The court's EPA ruling was about something much bigger than one agency*, THE WASHINGTON POST (3 July 2022) https://www.washingtonpost.com/opinions/2022/07/03/supreme-court-epa-decision-meaning/ ("the chief justice and his colleagues [in *West Virginia v. EPA*] began a long, long overdue trimming of the wildly overgrown federal administrative state."); Kristin E. Hickman & Aaron L. Nielson, *Narrowing Chevron's Domain*, 70 DUKE L.J. 931, 934 (2021) ("The Justices seem more willing to find clarity using traditional tools of statutory interpretation, thereby avoiding Chevron deference altogether."). The Supreme Court notably declined to mention *Chevron* in several statutory interpretation cases this term, further suggesting its decline. *See West Virginia v. EPA*,

10 F.4th 1279, 1283 (Fed. Cir. 2021).  In *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the Supreme Court considered whether the EPA exceeded the Clean Air Act's grant of authority, which required interpreting the statute.  The Supreme Court noted:  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  142 S. Ct. at 2607 (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)).  The Supreme Court further states:  "Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted."  *Id.* at 2607–08 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).[4]

"[A]n illegal exaction occurs . . . when the 'plaintiff has paid money over to the Government . . . and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020) (quoting *Virgin Islands Port Auth. v. United States*, 922 F.3d 1328, 1333 (Fed. Cir. 2019)).  Stated another way, illegal exaction cases are "those in which 'the Government has the citizen's money in its pocket' and the claim is 'to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute.'" *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007–08 (Ct. Cl. 1967) (citing *Clapp v. United States*, 117 F. Supp. 576, 580 (Ct. Cl. 1954)).

## IV.  *Chevron* Step One:  Whether the Fee Increase Statutes are Ambiguous Regarding the H-1B Petitions to Which the Increased Fee Applies

Plaintiffs argue the Public Law Numbers 111-230 and 114-113 ("Fee Increase Statutes") are unambiguous as "Congress spoke directly to the issue of when US[CIS] is permitted to collect additional fees from 50-50 Employers by expressly limiting the enhanced fee collection to an employer's 'application for admission' to classify the foreign national as an H-1B nonimmigrant."  Pls.' MSJ Mem. at 14 (citations omitted).  The government argues plaintiffs cannot prove Congress did not authorize USCIS to collect the increased fee from them "because the statute plainly conveys Congress' intent to subject all petitions for H-1B classification otherwise subject to the Fraud Fee to the increased fees mandated by [the Fee Increase Statutes]."  Def.'s Cross-MSJ at 16.  "To succeed in this action," the government notes "plaintiffs must prove that Congress did not authorize USCIS to collect the increased fee from 50/50 employers, like plaintiffs, when they filed petitions for change of status to H-1B classification for the nonimmigrant employees."  *Id.*

---

142 S. Ct. 2587 (2022); *American Hospital Ass'n v. Becerra*, 142 S. Ct. 1896 (2022); *Becerra v. Empire Health Found.*, 142 S. Ct. 2354 (2022).

[4] The opinion goes on to discuss "'extraordinary cases' that call for a different approach—cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).  In such cases, under the major questions doctrine, the agency must "point to 'clear congressional authorization' for the power it claims." *Id.* at 2609 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

In applying the Chevron doctrine, the Court must first consider "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984). In other words, the Court must decide whether the statute is ambiguous. *Id.* "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* To determine whether the statute is unambiguous, the Court must "employ[] traditional tools of statutory construction[.]" *Id.* at 842 n.9.

"Statutory interpretation begins with the words of the statute." *BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015). The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case[,]" and the inquiry ends if the statutory language is unambiguous. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). This plainness or ambiguity "is determined by reference to the [statutory] language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 56 (2012). The "context includes the purpose of the text," and "the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." [5] *Id.* As a guiding principle, the Court must not go "beyond the borders of the statute." *United States v. Great N. Ry. Co.*, 287 U.S. 144, 154 (1932).

---

[5] Although the government argues the Court "can consider legislative history," Def.'s Reply at 11, both parties agree the legislative history is unhelpful in this case. *See* Tr. at 154:6–7 (government counsel stating, "I don't think we need to resort to it . . . ."), 154:14–16 (government counsel describing the legislative history as "sparse"); 144:1 (plaintiffs' counsel agreeing "the legislative history is sparse"), 53:19–25 (plaintiffs' counsel describing the use of legislative history in *W. Union Tel. Co. v. Lenroot*, 323 U.S. 490, 502 (1945), as "a tortured mess"), 69:13–18 (plaintiffs' counsel commenting "the D.C. Circuit can't even agree on whether legislative history is supposed to be used and in what context."), 71:22–72:12 (plaintiffs' counsel stating, "[O]ne thing that appears to be foreclosed or at least discouraged is looking to legislative history, because that's . . . highly fraught with difficulty because you can look out into the audience and pick your friends. Particular statements by particular Congresspeople on the floor isn't necessarily reflective of the understanding that other members of Congress may have had, nor is it necessarily reflective of the ordinary meaning that the final text has. So I think the general tenor, at least the Supreme Court is leaning more towards a textualist approach, that at least at a minimum discourages looking at legislative history unless . . . everything else fails.").

The Court agrees legislative history is unhelpful in this case. First, as the parties state, the legislative history is sparse. Second, the legislative history does not strongly favor or disfavor either party's interpretation. The Government emphasizes Congress levied the fee broadly to "level the playing field for American companies and American workers to compete against these foreign companies known in the industry as using 'outsourcing visas.'" 156 Cong. Rec. S6838, S6839 (daily ed. Aug. 5, 2010) (statement of Sen. Charles Schumer); *see* Def.'s Cross-MSJ at 20. Plaintiffs argue nothing "in the legislative history the government cites indicate[s] that the Senators understood the phrase 'application for admission' to encompass change of status petitions." Pls.' Resp. & Reply at 11. Plaintiffs assert "the enhanced fee does not apply when employers are seeking to change the status of foreign nationals already admitted in another nonimmigrant category because the employer will not 'bring them here' from outside the United States." *Id.* at 12; *see* 156 Cong. Rec. S6838, S6839 (daily ed. Aug. 5, 2010) (statement of Sen. Charles Schumer). In response, the government argues plaintiffs focus too heavily on the phrase "bring them here," but fail to acknowledge the following clause "and then they stay here for a few years . . . ." Def.'s Reply at 12. "Thus, the legislative history is useful here only to show that Congress intended to benefit U.S. workers over foreign workers, which supports USCIS's longstanding interpretation applying the increased fee to H-1B petitions filed by covered employers when the Fraud fee applies[,]" the government argues. *Id.* Neither argument is persuasive,

The parties agreed there are no strict rules regarding statutory interpretation and no specific hierarchy of canons to follow. *See* Transcript ("Tr.") at 65:12–14 (plaintiffs' counsel agreeing there are no "very strict rules"), 67:2–3 (plaintiffs' counsel agreeing "I am not aware of any hierarchy of these various canons."), 68:22–24 (government counsel agreeing "the Supreme Court has not said that the canons are strict rules and must be followed in any particular manner"), ECF No. 52 (Transcript of Oral Argument on 1 April 2022).  Plaintiffs emphasize the text should control, citing *Bostock v. Clayton County*, 140 S. Ct. 1731 (2021), *see* Tr. at 69:5–10, while the government emphasizes the "interpretive canons are not rules of interpretation in any strict sense but presumptions about what an intelligently produced text conveys." Tr. at 68:18–20 (government's counsel referencing *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1173–74 (2021) (Alito, J. concurring) ("Yet the Scalia-Garner treatise makes it clear that interpretive canons 'are not "rules" of interpretation in any strict sense but presumptions about what an intelligently produced text conveys.' Reading Law 51.  (Even grammar, according to Mr. Garner, is ordinarily just 'an attempt to describe the English language as it is actually used.' B. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 1 (2016)).")).

As the dispute in this case is the applicability of the Fee Increase Statutes, the Court begins with the language of the statutes. *BASR P'ship*, 795 F.3d at 1342.  The 2010 Fee Statute provides:

> (b) Notwithstanding any other provision of this Act or any other provision of law, during the period beginning on [September 30, 2010] and ending on September 30, 2014, *the filing fee and fraud prevention and detection fee required to be submitted with an application for admission* as a nonimmigrant under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(i)(b)) *shall be increased by $2,000 for applicants* that employ 50 or more employees in the United States if more than 50 percent of the applicant's employees are such nonimmigrants or nonimmigrants described in section 101(a)(15)(L) of such Act.

2010 Fee Statute (emphasis added).  The 2015 Fee Statute provides:

> (b) Temporary H-1B Visa Fee Increase.—Notwithstanding section 281 of the Immigration and Nationality Act (8 U.S.C. 1351) or any other provision of law,

---

especially as the statements are only by one Senator and do not reflect the intent of Congress as a whole. *See id.* ("the statement by *the Senator does not evidence that the Senate intended* to limit the universe of petitions to which the increased fee applies to only those 'petitions involving an application for admission.'") (emphasis added).  The text, on the other hand, does reflect the intent of Congress as a whole, and therefore the text should be considered paramount.  While legislative history is one of the traditional tools of statutory construction the Court can use to determine the plainness or ambiguity of statutory language, *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1287 (D.C. Cir. 2000) (traditional tools of statutory construction include the "text, legislative history, structure, and purpose" of the statute at issue), legislative history cannot overcome the statutory text to provide a wider application of the statute than the plain meaning can bear.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002) (floor statements from two Senators cannot amend clear and unambiguous language).  The Court accordingly considers the text paramount and does not find legislative history persuasive, especially so in this case as the legislative history is not particularly persuasive for either party.

> during the period beginning on the date of the enactment of this section and ending on September 30, 2025, the *combined* filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(i)(b)), *including an application for an extension of such status*, shall be increased by $4,000 for applicants that employ 50 or more employees in the United States if more than 50 percent of the applicant's employees are such nonimmigrants or nonimmigrants described in section 101(a)(15)(L) of such Act.

2015 Fee Statute (emphasis added).  The INA defines:

> The term "application for admission" has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.

8 U.S.C. § 1101(a)(4) (2022).  The INA further defines:

> The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

*Id.* § 1101(a)(13)(A).  DHS's regulations also provide:

> [An] [a]pplication to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection . . .

8 C.F.R. § 235.1(a).

### A.  Ordinary Meaning of the Fee Increase Statutory Text

The parties agree the relevant statutory language in Pub. L. Nos. 111-230 (2010) and 114-113 (2015) are sufficiently similar to be analyzed together.  *See* Tr. at 32:17–19, 33:7–8 (both parties agreeing the two public laws can be analyzed together).  Both public laws use the same terminology, including the phrase "application for admission," which is defined in 8 U.S.C. § 1101(a)(4), and "admission," which is defined in 8 U.S.C. § 1101(a)(13)(A).  The statutory definition has the potential to be a controlling feature of interpretation, so the Court must consider at the outset whether the statutory definition applies.

### 1.  Whether the Court is Bound by the Statutory Definition

Plaintiffs first argue the Fee Increase Statutory text is clear because "Congress spoke directly to the issue of when US[CIS] is permitted to collect additional fees from 50-50 Employers by expressly limiting the enhanced fee collection to an employer's 'application for admission' to classify the foreign national as an H-1B nonimmigrant."  Pls.' MSJ Mem. at 14 (citations omitted).  Plaintiffs continue, "[t]he INA defines the terms 'application for admission' and 'admission,' 8 U.S.C. § 1101(a)(4), (13)(A)," *id.* at 11, and "[t]hose definitions convey the

unmistakable act of effecting a physical entry 'into the United States' after being inspected[,]" *id.* at 14 (citations omitted).

The government agrees, "the phrase 'application for admission' is defined in the INA as having 'reference to the application for admission into the United States,' and the INA defines 'admission' as meaning 'with respect to an alien, the lawful entry . . . into the United States after inspection and authorization by an immigration officer.'" Def.'s Cross-MSJ at 19 (citing 8 U.S.C. § 1104(a)(4), (13)(A)). Despite this, the government argues "a literal reading of the [Fee Increase S]tatutory text" using the definition creates "ambiguity in the language" leading to incongruous results, and therefore the definition should be disregarded. *Id.* at 20; Tr. at 51:25–52:1.

The timing of the H-1B process is significant in determining whether to apply the statutory definition. The language of the Fee Increase Statutes bridge two parts of the H-1B process—the submission of fees and application for admission—with the language "required to be submitted with." 2010 Fee Statute; 2015 Fee Statute. "[T]he process of individuals physically entering the United States," the government notes, "is separate from the process of employers filing petitions with USCIS, and no individual entering the United States pays both the filing fee and the Fraud fee that was increased by [the Fee Increase Statutes]." Def.'s Cross-MSJ at 2. The government argues, "the literal meaning of the phrase 'application for admission' concerns nonimmigrants physically presenting themselves for inspection and permission to enter the United States." *Id.* at 19. The government adds because employers pay the filing fee and fraud fee when they submit USCIS Form I-129, not individual nonimmigrants when they seek physical entry into the United States, "a literal reading of the statutory text would result in the increased fee never being applied or collected, which cannot have been Congress' intention[.]" *Id.* at 20. Concluding such, the government states the Court should instead consider the Fee Increase Statutes "as a whole and in context with the overall statutory scheme" because doing so resolves "the ambiguity in the language . . . and it becomes clear that the fee increase is intended to be applied to employers' petitions for H-1B classification when the Fraud Fee is otherwise required." *Id.*

Plaintiffs argue for a strict application of the statutory definition of "application for admission." Pls.' MSJ Mem. at 14–15. When asked at oral argument how the filing fee and fraud detection fee are submitted "with" the nonimmigrant's application for admission, plaintiffs responded the fees are "submitted with an application for admission that involves the employer's petition. There's no other way to submit it under the regulatory framework." Tr. at 135:14–16. Plaintiffs continued "[a] foreign national cannot make an application for admission unless the precondition for having an approved petition has already taken place in the context of an H-1B program." Tr. at 136:5–11. Plaintiffs further tried to reconcile the two by stating, "the employer['s] . . . petition is asking for permission to have the foreign national effect an entry in the United States" by "checking the appropriate box and informing Homeland Security whether the person is overseas or not, and that would alert Homeland Security whether there's an application for admission." Tr. at 135:9–11, 137:3–6.

"When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914 (2000); Pls.' MSJ Mem. at 11; Tr. at 51:14–16.

> [D]efinition by the average man or even by the ordinary dictionary with its studied enumeration of subtle shades of meaning is not a substitute for the definition set before use by the lawmakers with instructions to apply it to the exclusion of all others. There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves.

*Fox v. Standard Oil Co. of New Jersey*, 294 U.S. 87, 96 (1935). If, however, applying a statutory definition creates incongruity in the language, the definition is not controlling and may be abandoned in favor of congressional intent and the major purpose of the statute. *See Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) ("It is evident…that the definition of disability was 'not made with watch-like precision' and should not be so applied"); Def.'s Reply at 8; Tr. at 45:4–7; *see also Grey v. Pearson* [1857] 6 H.L. Cas. 61, 106 (per Lord Wensleydale) ("[I]n constructing . . . all written instruments, the grammatical and ordinary sense of the words is to be adhered to, unless that would lead to some absurdity, or some repugnance or inconsistency with the rest of the instrument[.]").

> It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive. Rare, but not inconceivable. . . . So where the artificial or limited meaning would cause a provision to contradict another provision, whereas the normal meaning of the word would harmonize the two, the normal meaning should be applied.

Scalia & Garner, *supra*, at 228.

At oral argument, plaintiffs contended the government misapplied *Lawson* because while it matters "whether there's an absurd result . . . that is contrary[,] the underlying touchstone, of course, is the intent of Congress." Tr. at 52:20–22. If applying the statutory definition leads to an absurd result which "contradicts Congress' intent, then, of course, the Court is not going to apply [the definition]," but "[i]t's a very narrow exception" which "doesn't apply here." Tr. at 52:25–53:2, 53:6, 53:8. Plaintiffs did, however, admit if the statute hypothetically used the word "admission" or "admitted" in a context that is very different, such as an admission to guilt for a crime, "[t]here would be no reason to apply the definition because . . . the target of that reference is not the subject matter under consideration by the Court." Tr. at 123:21–24.

The government argues *Lawson* and *Stenberg* are not at odds: "[*Lawson* is] not looking at a situation [like *Stenberg*] where the definition deviates from the normal or common usage of it. It's using the definition . . . in the statute leads to a result that's incongruous." Tr. at 51:23–52:1. The government "do[es not] disagree that the *Stenberg* case cites the general proposition that if a statute has a defined term, you use that term even if that defined term would differ from how we would normally use it," but here the exception applies "when using that

defined term leads you to . . . read the statute in a literal sense where it just doesn't make sense."
Tr. at 52:2–9.

To assess possible incongruity or absurdity caused by the definition, the Court must read
the definition into the Fee Increase Statute, which leads to the following:

> [D]uring the period beginning on the date of the enactment of this section and
> ending on September 20, 2025, the combined filing fee and fraud prevention and
> detection fee required to be submitted with an application for [*the lawful entry of
> the alien into the United States after inspection and authorization by an
> immigration officer*] as a nonimmigrant . . . shall be increased by $4,000 for
> applicants that employ 50 or more employees in the United States . . . .

2015 Fee Statute; 8 U.S.C. § 1101(a)(4), (13)(A) (emphasis added). As can be seen from
merging the definition in, the inclusion of the definition creates a conflict between the phrases
surrounding the emphasized language, including "required to be submitted with." At oral
argument, plaintiffs defined "with" as meaning "[a]t the same time." Tr. at 135:2.
Merriam-Webster's Dictionary defines "with" as "used as a function word to indicate a
participant in an action, transaction, or arrangement." Merriam-Webster, https://www.merriam-
webster.com/dictionary/with (last visited Aug. 8, 2022). The filing fee and fraud prevention fee,
however, are paid by the employer when the employer submits USCIS Form I-129, Tr. at
8:19–20; Def.'s Cross-MSJ at 2, while the application for admission—or lawful entry, as the
defined by statute—does not occur until after Form I-129 has been submitted, the H-1B visa has
been granted, and the nonimmigrant presents themselves at a port of entry. *See* Tr. at
15:20–16:14. These two events do not occur "with," or "at the same time" as each other.

Due to the temporal disconnect between the phrases surrounding the word "with," the
result would be the increased fee is never applied because these two events never happen at the
same time. Both parties agree, however, the Fee Increase Statutes give USCIS the authority to
collect increased fees. *See* Tr. 162:7–9 (plaintiffs' counsel admitting the statute gives USCIS
authority to collect increased fees "[i]n identified cases"); Def.'s MSJ Reply at 8. As the Fee
Increase Statutory text provides the increased fee must apply in certain circumstances, applying
the definition completely undermines the promulgation of an increased fee and would lead to an
"odd result" of the increased fee never being applied. *See Green v. Bock Laundry Mach. Co.*,
490 U.S. 504, 510–11 (1989) (finding when a "literal reading would compel an odd result[,]" the
statutory text "can't mean what it says."). Applying the statutory definition here is an example
of how "literalness may strangle meaning" which "[t]he decisions of [the Supreme Court] have
repeatedly warned against[.]" *Lynch v. Overholser*, 369 U.S. 705, 710 (1962) (internal citations
omitted). Congress could not have written a statute meant to increase a fee in such a way where
the increase is never applied because Congress does not intend incongruous or absurd results,
and therefore the obvious incongruity and absurdity caused by adhering to the statutory
definitions of "application for admission" and "admission" render the definition inapplicable in
this context. *See Lawson*, 336 U.S. at 201 (concluding "Congress would not have intended" a
result involving "obvious incongruities"); *Rowland v. California Men's Colony, Unit II Men's
Advisory Council*, 506 U.S. 194, 200–01 (1993) (finding Congress is presumed to legislate

knowing courts' "common mandate of statutory construction" requiring the avoidance of "absurd results") (citing *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991)).

In addition to reconciling the timing of each part of the process, the Court must also address the subject of each part of the process. The parties dispute whether "application" refers to the employer-filed H-1B petition or the foreign national's use of the approved H-1B petition at the border. Plaintiffs note "'application' and 'applicant' are different words, so the consistency presumption cannot carry the government's interpretation." Pls.' Resp. & Reply at 7. Plaintiffs assert "the 'applicant' refers to the employer . . . , but the 'application for admission' has reference to the foreign national the employer seeks to have admitted through its petition, *see* Form I-129, Part 2, Item 4.a, because, as the government concedes, the foreign national must be admitted to the United States." *Id.* at 8 (citations omitted). Plaintiffs state "[b]ecause the foreign national overseas makes his application for admission to the United States based on the employer's petition, *see* 8 U.S.C. § 1184(c)(1), the phrase 'application for admission' must refer to the employer's request to have the foreign national 'admitted' under its petition." *Id.*

The government responds "[i]t is incorrect to interpret the [Fee Increase Statutes] via the phrase 'application for admission' as defined in 8 U.S.C. § 1101(a)(4) (definitions for the INA) because doing so would create a disconnect between the word 'application' and the word 'applicant' in the same sentence." Def.'s Cross-MSJ at 25. The government reads the Fee Increase Statutory language as "increas[ing] fees submitted by the referenced 'applicant,' i.e. the employer, if the employer has a certain number and type of employees, in connection with the 'application' that the employer submits seeking H-1B status for its employees." *Id.* The government argues "[i]t is clear that 'applicant' refers to petitioning employers." *Id.* The government adds, "[i]t would be illogical if 'application' did not refer to a submission by employers, but instead to a request made by an individual alien to physically enter into the United States." *Id.* The government argues "[a]ccordingly, application and applicant must be construed to refer to the same entity, which in this case must be the employer paying the filing fee and the Fraud Fee when they file petitions on Form I-129 seeking H-1B classification." *Id.* at 25–26. The government further argues plaintiffs' argument "conflate[s] an 'application for admission' with a petition for H-1B status." Def.'s Cross-MSJ at 26.

Regarding the definition of "application" in reference to the "applicant," statutory definitions may be rendered inapplicable if they create incongruous or absurd results. *See Lawson*, 336 U.S. at 201; *Rowland*, 506 U.S. at 200–01. Plaintiffs' reading requires applicant and application to refer to different people. Both parties agree, only the employer pays the fraud fee, and in fact the nonimmigrant cannot pay the fraud fee. *See* Tr. at 12:1–3 (plaintiffs' counsel stating, "the foreign nationals are prohibited by regulation from the Department of Labor from paying those fees."), 13:12–13 (plaintiffs' counsel stating: "Yeah, the employer must always pay. There's no contention about that."); Def.'s Cross-MSJ at 2 (noting "the Fraud Fee is paid by a nonimmigrant's employer"). While the employer pays the fee, the nonimmigrant applies for physical admission—not the employer. Both parties also agree the term "applicant" refers to the employer. Tr. at 118:16–19. A literal reading would result in the increased fee never being paid, because the person who pays the fraud fee is not the same person who submits an *application for admission*. It would be absurd if in enacting a statute increasing a fee, Congress simultaneously intended the increased fee to never apply. Congress does not intend absurd results, and therefore

the incongruity between the words "application" and "applicant" caused by a strict application of the definition further supports finding the definition inapplicable in interpreting these Fee Increase Statutes. *See Lawson*, 336 U.S. at 201; *Rowland*, 506 U.S. at 200–01.

The government further argues plaintiffs' interpretation does not reflect the plain language of the Fee Increase Statutes because their interpretation requires the Court to interpret "fees submitted with an application for admission," which, as discussed do not occur together, as though it reads "fees submitted with *a petition involving* an application for admission." Def.'s Reply at 7–8 (emphasis altered). "Thus," the government argues, "plaintiffs' interpretation does not allow the Court to merely 'follow the plain text,' as plaintiffs claim." *Id.* at 8 (citing Pls.' Resp. & Reply at 4). At oral argument, the government stated the word "petition" would not necessarily need to be included because "the definitions in 8 C.F.R. 1.2 can mean application, could mean a benefit request, and a benefit request could mean a petition." Tr. at 90:6–9. According to the government, the issue arises when plaintiffs use "'application for admission' as the defined term" because it does not "identif[y] what petitions filed by the employers are going to be subject to the fee, because . . . those two fees . . . are not required to be submitted with the application for admission." Tr. at 90:12–18.

Plaintiffs' interpretation requires adding the words "a petition involving" before the phrase "an application for admission." If "application for admission" is used as defined, the universe of petitions subject to the fee is still unclear, and an additional phrase would need to be added to limit which petitions are subject to the fee. While adding these words might resolve the issue of the two filings happening "with" one another, plaintiffs' interpretation creates another problem. "[I]t is no more the court's function to revise by subtraction than by addition." Scalia & Garner, *supra*, at 174. Plaintiffs cannot both argue for a strict application of the definition of "application for admission" while simultaneously advancing a meaning that requires the addition of words. If "application for admission" is to be strictly read as defined, it should not also need extra clarifying language to achieve its meaning. The required addition of words to effectuate plaintiffs' preferred meaning leads the Court again to find the statutory definition inapplicable. *See id.*

As stated in *Lawson*, if applying a definition leads to incongruity and creates a result contrary to the statutory text, it is not to be followed. *See Lawson*, 336 U.S. at 201. Numerous incongruities exist when mechanically applying the statutory definition; there is incongruity in when the fees are paid and when the application for admission is made, and there is incongruity in who pays the fee (the employer) and who applies for admission (the nonimmigrant). These incongruities lead to an absurd reading of the Fee Increase Statutes where the language indicates a fee increase, and the increase could never be applied. It would be absurd to interpret the statutory language in this way.

> [W]e are not revising the apparent meaning of the text but are giving it the meaning that it would convey to a reasonable person, who would understand that misprints had occurred. What the rule of absurdity seeks to do is what all rules of interpretation seek to do: *make sense of the text.*

Scalia & Garner, *supra*, at 235 (footnote omitted) (emphasis added). The Court concludes if the statutory definition is used, it injects incongruity and absurdity into the Fee Increase Statutes, and therefore the Court will not apply the definition in interpreting the Fee Increase Statutes. *See Lawson*, 336 U.S. at 201; *Rowland*, 506 U.S. at 200–01.

## 2. If the Statutory Definition is Not Used

Plaintiffs argue "application for admission" must refer to physical admission. Pls.' MSJ Mem. at 15–16. The government responds USCIS's longstanding interpretation of the statute recognizes the Fee Increase Statutory language is silent as to which petitions the fee applies, so "USCIS interpreted the statute's ambiguity to apply to the fees to petitions for H-1B or L-1 classification when the fraud fee was otherwise required because the statutory language referred to [the increased] fees as being collected in addition to the already extant filing and fraud prevention and detection fees."[6] Def.'s Cross-MSJ at 18 (citing U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62280, 62322 (Nov. 14, 2019)) (internal quotations omitted).

The government explains "[t]he issue here is that the text of the statute does not reference 'petitions' for H-1B classification, but instead refers to the 'filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant under section 101(a)(15)(H)(i)(b)[.]'" *Id.* at 19 (quoting 2010 Fee Statute). The government therefore notes "USCIS has collected the increased fee for all petitions for an initial grant of H-1B status, which includes change of status petitions, and for petitions requesting a change of employer, because Section 1184(c)(12) requires that the Fraud Fee be paid in those situations." *Id.* at 18. The government also argues if the statutory definition is not applied, 8 C.F.R. § 1.2 states "application" means "benefit request," and "benefit request" can mean "any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit," and therefore "the Court could find that the inclusion of 'application' there refers to the petition by the employer." Tr. at 90:5–11.

If the Court does not follow the statutory definition of "application for admission," it must consider the terms in their "ordinary sense." *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009) (holding the narrow statutory definition of "political subdivision" did not apply to every use of the term, and instead the term should be interpreted in its "ordinary sense"). The "ordinary meaning" canon of statutory interpretation dictates words

---

[6] Plaintiffs characterize the government's argument as a "nothing equals something" argument. Pls.' MSJ Mem. at 22. Plaintiffs argue USCIS attempts to justify its fee collection "by claiming that the statute is silent on the issue[,]" however, plaintiffs argue "the agency cannot exercise a supposed delegated power merely because Congress has not expressly withheld such power." *Id.* at 20–21 (citations omitted). The parties agree Congress granted USCIS authority to collect increased fees. Tr. at 162:7–9 (plaintiffs' counsel admitting the statute grants USCIS authority to collect increased fees "[i]n identified cases"). The question then is to whom and in what circumstances should these fees apply. Here, to the extent the Fee Increase Statutes are ambiguous, the text directs employers to pay an increased fee but does not specify which petitions the increase would apply to. USCIS filled the gap by limiting the universe of petitions the increased fee would apply to; it did not extend its power or apply the increase to all fees, thus respecting its statutory authority. The Court finds, and the government agrees, the premise of plaintiffs' "nothing equals something" argument requires the Court to accept plaintiffs' interpretation of the Fee Increase Statutes. *See* Tr. At 165:3–6. For the reasons stated *infra* this section, the Court rejects plaintiffs' interpretation.

must be employed in their "natural sense." *Gibbons v. Ogden*, 22 U.S. (9Wheat.) 1, 71 (1824). The Court must "determine whether the language at issue has a plain and unambiguous meaning."[7] *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

While the "ordinary sense" or "plain meaning" of the term "admission" can refer to physical admission, as plaintiffs contend, it can also refer to admission into a group or status as the government contends, such as an attorney's "admission" to the bar. "Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended. One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise." Scalia & Garner, *supra*, at 70. Merriam-Webster's Dictionary defines "admission" as "the fact or state of being admitted" and includes (a) "the act of allowing something for consideration before a court"; (b) "the right or permission to join or enter a place, a group, etc."; (c) "the act or process of accepting someone as a student at a school"; and (d) "the act or process of accepting someone into a hospital, clinic, or other treatment facility as an inpatient." Merriam-Webster, https://www.merriam-webster.com/dictionary/admission (last visited Aug. 8, 2022). This definition shows there is no singular meaning of "admission" requiring it to be physical. In the broader context of H-1B visas, the "contextually appropriate ordinary meaning" of "application for admission as a nonimmigrant" falls into Dictionary category (b)—when an employer seeks H-1B status for an employee, the employer fills out USCIS form I-129 not to petition for the nonimmigrant's physical admission to the United States, but for the nonimmigrant's status to allow them to work within the United States.

Further examining the "ordinary sense" of the terms of the Fee Increase Statutes, the Court looks to the process of seeking an H-1B visa. Regarding any difference in process if the nonimmigrant is inside or outside the United States, plaintiffs note "[t]he instructions to Form I-129 state that the employer should check Box 4.a in Part 2 of Form I-129 if the foreign national is outside the United States and will need to obtain a visa overseas or seek admission." Pls.' Resp. & Reply at 5 (citing Def.'s Cross-MSJ App. at 5, ECF No. 45). Plaintiffs state "USCIS

---

[7] When asked whether the use of "corpus linguistics" would be helpful in examining the phrase "application for admission" and "applicant" in the context of immigration and H-1B visas, both parties expressed concern. *See* Tr. at 173:19–23 (plaintiffs' counsel stating: "I don't know that it would be particularly helpful to run such a search given the highly refined parameters in which the linguistic usage is being done in this case, having been defined by Congress in the statute."); 174:2–3 (government's counsel stating: "I don't think that we believe it's necessary in this case either."). Corpus linguistics is not brand new to the judicial system; recent federal court opinions have used corpus linguistics to interpret the meaning of statutory terms by referencing "books, scripts, magazines, newspapers, and more." *Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1, 13 n.6 (2020) (quoting *Caesars Ent. Corp. v. Int'l Union of Operating Eng'rs Loc. 68 Pension Fund*, 932 F.3d 91, 95 n.1 (3d Cir. 2019) (using corpus linguistics to interpret "previously")); *see Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682–83 (6th Cir. 2022) (using corpus linguistics to interpret "reckless driving"); *United States v. Rice*, 36 F.4th 578, 583 n.6 (4th Cir. 2022) (using corpus linguistics to determine whether "strangulation" requires intentional conduct). To conduct a corpus linguistics inquiry, a "corpus," or a "database of…naturally occurring language" is used. *Nycal Offshore Dev. Corp.*, 148 Fed. Cl. at 13 n.6 (quoting *Caesars Ent. Corp.*, 932 F.3d at 95 n.1). The analysis includes "measuring . . . the statistical frequency of a word and the linguistic contexts in which it appears." *Id.* (quoting *Caesars Ent. Corp.*, 932 F.3d at 95 n.1). The Court ran a preliminary corpus linguistics search and found the phrase "application for admission" has been used 72 times in Supreme Court decisions, and it mostly appears in cases concerning the application for admission into a university or state bar. A few discuss immigration status, bail, writ of habeas corpus, and admission into a mental institution, while others discuss "application for admission" into membership of a club or the like. This preliminary search reveals the plain meaning of "application for admission" can be broader than just physical admission.

further facilitates the admission process by sending the employer's approved petition overseas to a consulate where the foreign national applies for a visa to seek admission to the United States." *Id.* at 5–6 (citations omitted).

The Court considers whether there is a practical difference between an employer filing USCIS Form I-129 for a nonimmigrant already in the United States versus one outside the United States. The process begins when the employer submits Form I-129 to USCIS. Tr. at 8:19–21; Def.'s Cross-MSJ at 4 (citing 8 U.S.C. § 1184(c); 8 C.F.R. §§ 103.2(a), 214.2(h)(2)(i)(A)). This form must be completed by the employer when they request a nonimmigrant receive the H-1B classification to work in the United States in a qualified specialty occupation. *See* Tr. at 8:14–24; Def.'s Cross-MSJ at 3 (citing 8 U.S.C. § 1101(a)(15)(H)(i)(b)). The only minor difference is whether they check box 4(a) for a nonimmigrant outside the United States or check box 4(b) for a nonimmigrant inside the United States. *See* Tr. at 31:18–22. In fact, from the employer perspective, other than those two checkboxes, the process is identical in both situations. *See* Tr. at 13:25–14:9. Employers must pay both the filing fee and fraud fee "in conjunction with actually filing the form I-129." Tr. at 9:1–3; *see* Def.'s Cross-MSJ at 5 (citing Def.'s Cross-MSJ App. at 26). The base filing fee and fraud fee do not differ based on whether the nonimmigrant is located in or outside the United States. Tr. at 10:23–11:2. After the employer submits the form and pays the fees, the employer must wait for "confirmation from USCIS that the classification status has been granted to th[e] nonimmigrant beneficiary." Tr. at 9:18–20. After confirmation is received, there is nothing else the employer must do. Tr. at 10:4–11. This is the same regardless of whether the nonimmigrant is located inside or outside the United States and, therefore, there is no difference from the applicant employer's perspective in the process between the two categories of nonimmigrants that would justify a fee increase for one over the other. Tr. at 22:17–23:3 (plaintiffs describing the difference for the *nonimmigrant*, not the employer).

Plaintiffs agree once the employer's role in the process ends—when confirmation from USCIS is received—the process differs from the *nonimmigrant*'s perspective. If the nonimmigrant is located outside the United States, they must go to the consulate to obtain a nonimmigrant visa "in order to present that approved visa . . . to the Customs and Border Protection officer at the port of entry when they seek admission to the United States." Tr. at 20:24–21:4. At this point in the process, the nonimmigrant must file DOS Form DS-160 and pay a fee to the Department of State at the consulate while applying for the nonimmigrant visa. Tr. at 21:5–12, 26:14–17. After the nonimmigrant has submitted the fee to the Department of State and has been interviewed by the consular officer, then "the consular officer stamps the foreign national's passport with a nonimmigrant visa." Tr. at 22:8–15. For a nonimmigrant already inside the United States under a different classification, for example a student on an F-1 visa, once the employer submits USCIS Form I-129, pays the fees, and receives confirmation from USCIS, nothing else needs to be done by the nonimmigrant and no additional fees must be paid. *See* Tr. at 24:7–23. From the government's perspective, any additional processing required for nonimmigrants outside the United States is conducted by the Department of State rather than USCIS. *See* Tr. at 95:9–97:4 (plaintiffs agreeing "the extra hurdles that are done by the United States Government, say, at the [overseas] consulate . . . all of that is done on the part of the Department of State. It's not the [US]CIS.").

The difference in the application process from the nonimmigrant's perspective does not matter because the interpretive issue concerns a fee paid *by the applicant employer*, and, therefore, the *employer*'s perspective is what matters.  Because there is no difference in process between a nonimmigrant inside or outside the United States from the employer's perspective, the "ordinary" or "natural" sense of the phrase "application for admission" suggests there is no practical reason for the increased fee to apply to one situation and not the other.  *See Nw. Austin Mun. Util. Dist. No. One*, 557 U.S. at 206; *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 71 (1824).

Plaintiffs also argue the government's argument "fails because it requires the Court to ignore the express terms 'application for admission' that Congress used to define when the enhanced fee applies."  Pls.' Resp. & Reply at 3 (citation omitted).  At oral argument, plaintiffs stated, "the [g]overment's position would be completely clear and acceptable if you had read those words, 'application for admission,' out of the statute, but the problem with the [g]overnment's case is . . . the Court has to give effect to all words."  Tr. at 104:17–21.

When asked at oral argument what effect USCIS has given to the phrase "application for admission," the government responded:  "They're giving effect to the phrase generally and not reading it out entirely, as [p]laintiffs contend, by interpreting that phrase to refer more generally to the application as used in the CFR def[inition]s, which goes to the petition for a benefit request for a nonimmigrant."  Tr. at 98:15–20.  As stated *supra*, the government points to 8 C.F.R. § 1.2 which defines "application" as "benefit request," which can include a "petition."  8 C.F.R. § 1.2; Tr. at 90:5–11.  The government continued "if 'application' there is to mean anything—because it doesn't specifically mean the definition of 'application for admission,' it has to mean or refer to the petitions filed by the employer, because that is when the filing fee and the fraud fee are submitted."  Tr. at 99:12–17.

"It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute."  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)) (internal quotations omitted).  Relatedly, it is also a "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (internal quotations omitted).  To avoid superfluity, the words "for admission," must mean something.  *See id.*  As the government explains, the words "for admission" do have meaning.  As discussed *supra*, "admission" can include admission to a status, *see* Merriam-Webster, https://www.merriam-webster.com/dictionary/admission (last visited Aug. 8, 2022), and application can mean "petition," 8 C.F.R. § 1.2.

Plaintiffs argue interpreting "application for admission" to mean "petition for status" improperly "conflate[s] admission with change of status."  Pls.' MSJ Mem. at 18.  "An 'admission' is a procedurally regular form of physical entry into the United States, while 'status' refers to the foreign national's legal standing to remain in the United States."[8]  *Id.* (citations omitted).  Plaintiffs also note Congress reinforced the distinction between "admission" and

---

[8] Plaintiffs admit, "[i]n some rare cases . . . status and admission are blurred" but these cases are "not applicable here[.]"  Pls.' MSJ Mem. at 18 n.15.

"status" as "Congress established different procedures governing the admission of a foreign national to the United States, *see* 8 U.S.C. § 1225(a)(3), (b)(1), and the separate process for changing the foreign national's nonimmigrant status after he is already admitted to the United States." *Id.* (citing 8 U.S.C. § 1258(a)). Plaintiffs state lawful admission is a prerequisite "to chang[ing] status to another nonimmigrant classification." *Id.* at 19 (citations omitted). Plaintiffs characterize the government's argument that its interpretation maintains the distinction between "application for admission" and "change of status" as "the following non-sequitur: when the enhanced fee applies, employers are responsible for paying it; because employers are responsible for paying the enhanced fee, the enhanced fee applies when they file a petition." Pls.' Resp. & Reply at 9. Plaintiffs assert the government's argument "confuses *who* pays the enhanced fee with *when* the enhanced fee is paid." *Id.* (citation omitted).

In response, the government argues "USCIS's interpretation accounts for the fact that the filing fee and Fraud Fee referenced in the statutes are not paid by nonimmigrants, but are instead paid by the employers petitioning USCIS for H-1B status for nonimmigrant employees." Def.'s Cross-MSJ at 28. At oral argument, the government explained "the reason we're not conflating two concepts is because those two distinct issues, the situation where a nonimmigrant is not in the United States . . . versus a change of status . . . are both situations covered by the fraud fee explicitly." Tr. at 116:7–13. The government continued: "So from that standpoint, whatever distinctions may be made in other contexts, the fee here being increased is a fraud fee, and that fraud fee . . . covers both of those scenarios." Tr. at 116:14–17. The government added "there's no conflation. It's merely giving meaning to what Congress is doing, which is increasing a fee, and that fee applies to a number of distinct situations for petitions, and that's what is giving effect." Tr. at 116:17–21.

A plain reading recognizes "change of status" and "application for admission" are both encompassed in the fraud fee. *See* 8 U.S.C. § 1184(c)(12) ("In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition . . . initially to grant an alien nonimmigrant status described in subparagraph (H)(i)(b) or (L) of section 1101(a)(15) of this title"). An initial grant of status includes petitions for change of status and therefore both are subject to the fraud fee. *See* Tr. at 76:17–21; Def.'s Cross-MSJ at 18; Tr. at 13:12–13. Additionally, as stated *supra*, "admission" can include admission into a status, and "application" can be synonymous with "petition." *See* 8 C.F.R § 1.2. "Admission" is broad enough to encompass change of status, extension of status, and physical entry with new status, and is modified by the next phrase, "as a nonimmigrant." Framing the increased fee in terms of when the fraud fee is paid necessarily includes change of status petitions, therefore giving meaning to every word and avoiding superfluity. *See Williams*, 529 U.S. at 404; *TRW Inc.*, 534 U.S. at 31.

Plaintiffs also assert the government's argument "neglects to explain why Congress chose such a round about [sic] way of saying something so simple as the government proposes." Pls.' Resp. & Reply at 3 (citing *Sullivan v. Everhart*, 494 U.S. 83, 90 (1990)). In *Sullivan*, the Supreme Court rejected a proposed meaning of a statute where "it would have been more natural" for Congress to adopt more direct language to effectuate that meaning. *Sullivan*, 494 U.S. at 90. The government agrees USCIS's interpretation would be more clearly understood if Congress had adopted different language. *See* Tr. at 103:19–104:13 (government's counsel

stating:  "That certainly would be clear if Congress just said every—every time a fraud free [sic] applies, apply this increased fee.").  Plaintiffs' interpretation, however, would also be more natural if Congress had used different language.  Just because it would have been more effective for Congress to have used different language does not mean one interpretation should be favored over the other as both interpretations could have been "more natural" with "more direct language."  *Sullivan*, 494 U.S. at 90.

When the statutory definition is not applied, the Court is left to consider the plain meaning of the Fee Increase Statutes.  *See Nw. Austin Mun. Util. Dist. No. One*, 557 U.S. at 206; *Sigmon Coal Co.*, 534 U.S. at 450; *Gibbons*, 22 U.S. (9 Wheat.) at 71 (applying the "ordinary meaning" canon).  The Fee Increase Statutes state "the filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant . . . shall be increased . . . ."  2010 Fee Statute; 2015 Fee Statute.  After not applying the statutory definition due to incongruity and absurdity, the Court finds the plain meaning of "admission" encompasses change of status, and "application" also means "petition."  *See* Scalia & Garner, *supra*, at 235 (stating the purpose of the absurdity doctrine is to "make sense of the text"); 8 C.F.R. § 1.2 (stating "application" can mean "petition").  The Court finds the plain meaning supports an interpretation whereby USCIS is authorized to collect an increased fee from employers regardless of whether the nonimmigrant is inside or outside the United States— including change of status petitions.  In interpreting the Fee Increase Statutes, the Court has not "traveled…beyond the borders of the statute."  *Great N. Ry. Co.*, 287 U.S. at 154 (applying the supremacy-of-text principle).

### B.  Structure of the Fee Increase Statutory Scheme

Plaintiffs argue the statutory structure favors their interpretation by stating "Congress's use of identical terms with the same meaning in different portions of the same statute indicate its intent to apply the additional fee only to petitions resulting in an application for admission by the foreign national at the border."  Pls.' MSJ Mem. at 16 (citation omitted).  For support, plaintiffs note "[i]n another section of Public Law No. 114-113 addressing requirements for foreign nationals entering under the visa waiver program, Congress imposed the further condition that the 'alien, at the time of application for admission, is in possession of a valid unexpired passport[.]'"  *Id.* at 15 (citation omitted) (emphasis removed).  Plaintiffs argue as "Congress was addressing passport requirements, its use of the term 'application for admission' in that context reveals its reference to events at the port of entry."  *Id.* at 16 (citation omitted).

The government argues "Section 1187 is unrelated to the fees at issue in this case, and therefore provides no context upon which to interpret Congress' intent regarding application of the increased fee in [the Fee Increase Statutes]."  Def.'s Cross-MSJ at 27.  The government states "[i]n addition, Section 1187 does not concern petitions for H-1B status for temporary skilled nonimmigrants, but instead deals with aliens seeking entry as visitors for business or pleasure."  *Id.* (citing 8 U.S.C. § 1187(a)(1)).

"[W]ords repeated in different parts of the same statute generally have the same meaning."  *Law v. Siegel*, 571 U.S. 415, 422 (2014); *see also United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 512 n.5 (1992) ("Our normal canons of construction caution us to read

the statute as a whole, and, unless there is a good reason, to adopt a consistent interpretation of a term used in more than one place within a statute."). This, however, is not always the case, and repeated words or phrases may have meanings that differ based on context. *See West Virginia v. EPA*, 142 S. Ct. at 2614–15. In *West Virginia v. EPA*, the Supreme Court rejected the government's argument suggesting the word "system" in Section 111 of the Clean Air Act includes generation shifting because "the Act elsewhere uses the word 'system' or 'similar words' to describe cap-and-trade schemes or other sector-wide mechanisms for reducing pollution." *Id.* at 2614. The government posited to the Supreme Court, "[i]f the word 'system' or similar words like 'technique' or 'means' can encompass cap-and-trade, . . . why not in Section 111?" *Id.* at 2615. The Supreme Court found several reasons to reject the broad use of the term "system" in Section 111, including the difference between other parts of the Act which have already established limits and Congress's clarity on the inclusion of cap-and-trade in other sections unlike in Section 111. *Id.*

Plaintiffs make a similar argument here, and their argument fails for reasons similar to *West Virginia v. EPA*. Section 1187, cited by plaintiffs, which uses the phrase "application for admission," has nothing to do with H-1B visas for nonimmigrants but rather concerns foreign nationals traveling for business or pleasure. The context of the two provisions is completely different. Additionally, using the phrase "application for admission" to refer to physical entry in the Fee Increase Statutes, as the phrase is used in Section 1187, results in incongruity or absurdity, as discussed *supra* in Section IV.A.1. This meaning cannot be forced on this provision simply because it is used in another section of the statute. *See West Virginia v. EPA*, 142 S. Ct. 2587.

The consistency canon is "so often disregarded" and is "particularly defeasible by context." Scalia & Garner, *supra*, at 171. Scalia and Garner provide the "prime example of a defeasance by context . . . given long ago by Henry Campbell Black" as follows:

> A statute providing that a person who, "being married, . . . marr[ies] any other person during the life of the former husband or wife" is guilty of a felony. The first use of *marry* refers to a valid marriage, but if the statute is going to make any sense, the second use cannot mean the same thing, but must denote going through the ceremony of marriage (though ineffectually). A more careful drafter might have written, in the second instance, *purports to marry* or *goes through a marriage ceremony with*.

*Id.* (footnote omitted) (citing Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws 146–47 (2d ed. 1911)). Similarly, the meaning of the phrase "application for admission" must mean two different things within the statute in order for the meaning in this context to "make any sense." *Id.* (footnote omitted) (citing Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws 146–47 (2d ed. 1911)); *see supra* Section IV.A.1.

Plaintiffs also argue the title of the 2015 Fee Statute, "9-11 Response and Biometric Entry-Exit Fee," "shows Congress's intent to limit those additional fees to petitions connected to applications for admission at the border." Pls.' MSJ Mem. at 16 (citations omitted). Plaintiffs add "[t]he title's reference to funding for border operations is further reinforced by Congress's

directive that the Secretary of Homeland Security draw on those earmarked additionally collected fees 'without further appropriation for implementing the biometric entry and exit data system described in [8 U.S.C. § 1365b].'" *Id.* (citation omitted).

Although the government admits the title of the 2015 Fee Statute "identif[ies] that these increased fees are ones to be deposited in a general fund of the Treasury known as the '9-11 Response and Biometric Exit Account[,]'" the government argues the title "cannot limit the plain meaning of the text." Def.'s Cross-MSJ at 28 (citing *Bhd. of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528 (1947)) (internal quotations omitted).

"[H]eadings and titles can do no more than indicate the provisions in a most general manner[.]" *Bhd. of R. R. Trainmen*, 331 U.S. at 528. As for the importance of the title of the 2015 Fee Statute, "9-11 Response and Biometric Entry-Exit Fee," even plaintiffs admit a "statutory title could never limit or abrogate the words of the statute," but it is "merely a helpful device" which "doubles down the clarity that's already there in the text." Tr. at 150:24–25, 151:14–16. While the title may suggest a focus on entry/exit, the fraud fee referenced in the 2015 Fee Statute itself is not limited to petitions involving entry or exit; the fraud fee is required for employers seeking H-1B status for nonimmigrants regardless of whether they are located inside or outside the United States. Tr. at 10:23–11:2. This suggests the use of "entry-exit" in the title cannot be read to limit the content of the statute. The title can also be explained by considering where the funds are deposited. In the reauthorization, Congress designated the funds were to be deposited into a "general fund of the Treasury known as the '9-11 Response and Biometric Exit Account.'" Def.'s Cross-MSJ at 28 (citing 2015 Fee Statute). The title, therefore, simply directs into what account the funds are to be deposited; it does not limit USCIS to only applying the enhanced fee to petitions involving entry/exit.

Reading the Fee Increase Statutes as a whole and in context of the overall fee scheme, the government states "the Court must consider when those other fees are imposed as context for determining when the increased fee applies." *Id.* at 22 (citation omitted). The government states "the Supreme Court has emphasized that definitions of component words alone are not sufficient in determining whether a statutory provision has a plain and unambiguous meaning; instead, the Court must look to the context in which the language is used as well as the broader context of the statute." *Id.* at 21 (citations omitted). The government argues the Court should find the increased fee applies whenever the Fraud Fee applies because the statute provides the "filing fee and fraud prevention and detection fee required to be submitted with an application of admission . . . shall be increased . . . ." *Id.* at 21–22 (quoting 2015 Fee Statute).

The government states the Fraud Fee applies "with all petitions for an 'initial' grant of H-1B status as well as petitions to change employers for nonimmigrants already in the United States who have previously been granted H-1B status." *Id.* at 22 (citing 8 U.S.C. § 1184(c)(12)). The government continues: "Petitions for an initial grant of H-1B status include both situations where the nonimmigrant is outside of the United States and is coming to work in the United States as an H-1B worker," and "situations where the nonimmigrant is already present here under a status other than as a temporary skilled worker under the H-1B program . . . but seeks to have his or her status changed to an H-1B classification." Def.'s Cross-MSJ at 22–23 (citation omitted). The government argues "the Fraud Fee is not premised on the physical location of the

nonimmigrant" by noting "Section 1184 . . . expressly mandates that the Fraud Fee applies to petitions 'to obtain authorization for an alien having such status [H-1B] to change employers.'" *Id.* at 23 (quoting 8 U.S.C. § 1184(c)(12)(A)(ii)).  The Fraud Fee provision provides:

> [T]he Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1) – (i) initially to grant an alien nonimmigrant status described in subparagraph (H)(i)(b) or (L) of section 1101(a)(15) of this title; or (ii) to obtain authorization for an alien having such status to change employers.

8 U.S.C. § 1184(c)(12).  Plaintiffs argue against this, stating the government's reference to the Fraud Fee statute, 8 U.S.C. § 1184(c)(12)(A), is unavailing because the Fraud Fee statute lacks the words "application for admission" Congress used in Fee Increase Statutes.  Pls.' Resp. & Reply at 4–5.

As the government asserts, the structure of the statutory scheme and reference to the fraud fee requires the Court to consider when the other fees are paid and to apply the increase accordingly.  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012); *see BASR P'ship*, 795 F.3d at 1343 ("[A court] cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").  The fraud fee is paid whenever an employer files a petition "initially to grant an alien nonimmigrant status" or "to obtain authorization for an alien having such status to change employers."  8 U.S.C. § 1184(c)(12).  "Initial grants" include both situations where the nonimmigrant is seeking physical admission to the United States as well as when the nonimmigrant is seeking change of status and is already present in the United States. *See* Tr. at 76:17–21; Def.'s Cross-MSJ at 18.  The context of the larger statutory scheme and the fraud fee support USCIS's interpretation of the statute as authorizing USCIS to collect the increased fee for change of status petitions.

Other uses of the phrase "application for admission" and appeals to the title of the 2015 Fee Statute are not compelling reasons to limit the increased fees only to situations involving physical entry to the United States, and therefore the Court finds the statutory structure supports an interpretation whereby USCIS is authorized to increase the fee for change of status petitions. *See West Virginia v. EPA*, 142 S. Ct. at 2614–15; *Bhd. of R. R. Trainmen*, 331 U.S. at 528.

## C. Whether Congress Reauthorizing the Increased Fee Statute Ratifies USCIS's Interpretation

The government argues:  "Congress reauthorized the statute through Public Law No. 114-113, but did not change the statutory language notwithstanding that USCIS had been, for five years, applying the increased [fee] to all petitions for H-1B status, including the change of status petitions challenged by plaintiffs in this case," which "shows that USCIS's interpretation of the statute comports with Congressional intent."  Def.'s Cross-MSJ at 23.  The government argues there is some indication Congress was aware of USCIS's interpretation of the 2010 statute as "Congress amended the statute to clarify that the increased fee applied to the 'combined'

filing fee and Fraud fee, which referenced USCIS's practice of applying the fee increase once to each petition rather than applying the increase to both the filing fee and the Fraud fee individually." Def.'s Reply at 9–10 (citation omitted). The government further argues "the inclusion of ['including an application for an extension of such status'] also indicates Congress's awareness of USCIS's interpretation which it ratified by reenacting the statute."[9] *Id.* at 10.

Plaintiffs argue "the ratification doctrine does not apply where the statute plainly precludes the agency's interpretation." Pls.' Resp. & Reply at 10 (citing *Brown v. Gardner*, 513 U.S. 115, 121 (1994)). Plaintiffs thus argue, for the government to be correct, Congress would have needed to have "expressly chang[ed] the plain terms of the Public Law." *Id.* Plaintiffs also argue "the government's argument . . . fails to provide evidence that in enacting [the 2015 Fee Statute] Congress approved or was even aware of USCIS's cumbersome interpretation contrary to the plain text of [the 2010 Fee Statute]." *Id.*

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]" *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978). The ratification presumption applies where there is some indication Congress was aware of the interpretation at issue and gave some affirmative indication of that awareness. *See ACLU v. Clapper*, 785 F.3d 787, 819 (2d Cir. 2015) (no presumption in situation where knowledge of program was intentionally kept to a minimum in Congress); *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 490 (1st Cir. 2016) (no evidence that Congress sought to ratify an ambiguous term).

While plaintiffs are correct there does not appear to be any specific evidence Congress was aware of USCIS's interpretation of when the increased fee applied, the government is also correct Congress was aware of at least *some* of what USCIS was doing because Congress made *some* revisions in the 2015 re-enactment. *See* 2015 Fee Statute. Congress must have known USCIS was applying the increased fee to the "combined" filing fee once to each petition,

---

[9] Plaintiffs state, "two courts preliminarily enjoined USCIS's final rule" to "extend[] the enhanced fee collection to any 50-50 Employer who files a petition to extend the status of its current employee already working in H-1B classification" and thus "the agency has apparently not applied the new enhanced fee requirement for extensions of status owing to those injunctions." Pls.' MSJ Mem. at 22. Injunctions aside, plaintiffs argue the extension of status language should not apply because plaintiffs state: "[they] are not requesting the refund of fees exacted by USCIS for petitions to extend 'such status' 'under section 101(a)(15)(H)(i)(b).' Rather, their change of status petitions . . . involved situations where the plaintiffs requested to change the status of their employees to H-1B status from a different nonimmigrant classification." *Id.* at 23 (citations omitted). Plaintiffs argue, the government's argument on this point "concedes that USCIS did not and will not be collecting enhanced fees for extensions of status." Pls.' Resp. & Reply at 15.

The government argues the Court need not address plaintiffs' argument regarding extensions of status because it is based on a hypothetical. Def.'s Cross-MSJ at 33. The government notes "plaintiffs do not allege that USCIS has ever asserted that it has authority to collect the increased fees on petitions to change a nonimmigrant to H-1B classification . . . based on the statutory provision 'including an application for an extension of such status' contained in [the 2015 Fee Statute]." *Id.* at 33–34. "Indeed, USCIS has not so contended in the final rule that plaintiffs cite as the basis for this contention." *Id.* at 34 (citing 85 Fed. Reg. at 46866–67).

USCIS imposed the increased fee on plaintiffs because it interpreted the statute as applying the increased fee anytime the fraud fee applied. USCIS did *not* impose the increased fee on plaintiffs because it believed the change of status petitions to be covered by the extension of status language added in the 2015 statute. The Court finds no need to address this argument further.

because it added the word "combined" in the 2015 Fee Statute.  *See id*.  Congress's awareness of USCIS's interpretation of the "combined" filing fee is enough to suggest they were aware of USCIS's interpretations and practices generally, including of applying the increase to petitions involving physical entrance and H-1B status as well as a change of status to H-1B.

Even if plaintiffs are correct Congress only added the word "combined" to indicate Congress intended the government deposit the increased fees in an earmarked account, Tr. at 143:10–15, Congress also shows awareness of USCIS's application of the law by adding the phrase "including an application for an extension of such status."  2015 Fee Statute.  This addition directed USCIS to apply the increased fee to extension of status petitions, which were previously not subject to the increased fee.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. at 62322 (explaining USCIS applied the 2010 increase "with respect to petitions for an initial grant of status or requesting a change of employer, *but not to extension petitions* filed by the same employer on behalf of the same employee." (emphasis added)).  The addition also suggests Congress intended for the increased fee to apply to change of status petitions.  If Congress knew the increased fee *was not* being applied to extension of status petitions, Congress also likely knew the increased fee *was* being applied to change of status petitions, and thus the re-enactment of the statute without change to "application for admission" suggests USCIS's interpretation was permitted by Congress.  In light of this likely awareness, Congress's failure to modify the "application for admission" language further indicates ratification because Congress could have changed the language of the statute if it disagreed with how the statute was being applied, but it did not.  *See Lorillard*, 434 U.S. at 580–81; *Clapper*, 785 F.3d at 819.

In addition to suggesting congressional awareness of USCIS's application of the increased fee, the inclusion of applications for "an extension of such status" in the 2015 Fee Statute bolsters the plain understanding of the phrase "application for admission."  2015 Fee Statute.  What precedes the phrase necessarily includes it.  *See Barnhart v. Thomas,* 540 U.S. 20, 26 (2003) (citing grammatical rule of the last antecedent, according to which a limiting clause or phrase should ordinarily be read to modify the noun or phrase it immediately follows).  The "fee required to be submitted with an application for admission" precedes the phrase "including an application for extension of such status."  The word "including" means exactly that—extensions of status are "included" in the situations where the increased fee applies.  Because applications for extension of status involve nonimmigrants who are already in the United States and do not involve physical admission, the "fee required to be submitted with an application for admission" also cannot hinge on physical admission in to properly include the phrase added after it.  The increased fee associated with the application for admission must include applications for extension of status, otherwise, the addition would contradict the original text.  Reference to an application for admission accordingly cannot limit the universe of petitions to those only involving nonimmigrants outside the United States.  The addition of applications for extension of status also undermines plaintiffs' argument on the title of the section, discussed *supra* in Section IV.B.  If "9-11 Response and Biometric Entry-Exit Fee" is read to suggest an increased fee only when a nonimmigrant is *outside* the United States, adding applications for extension of status, which, once again, involve nonimmigrants *inside* the United States, would contradict the statutory language.

Plaintiffs are incorrect the statute precludes the agency's reading for all reasons discussed *supra* regarding the permissiveness of the government's interpretation. From both grammatical and practical perspectives, the Court finds Congress's 2015 reauthorization as indicating congressional approval of USCIS's applying the increased fee to change of status petitions. *See Lorillard*, 434 U.S. at 580–81; *Clapper*, 785 F.3d at 819.

### D. Conclusion Regarding the Fee Increase Statutes' Ambiguity

Plaintiffs state, and the government agrees, "if the Court determines that a statute unambiguously answers the precise question at issue, then any interpretation at odds with the unambiguous text must be rejected." Def.'s Cross-MSJ at 30 (first citing *Nat'l Ass'n of Mfrs.*, 10 F.4th at 1280; then citing *Wyeth v. Kappos*, 591 F.3d 1364, 1372 (Fed. Cir. 2010); and then citing Pls.' MSJ Mem. at 21). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Sigmon Coal Co.*, 534 U.S. at 462.

When the statutory definitions of "application for admission" and "admission" are used, the result is incongruous with the text's imposition of an increased fee, and the statutory definitions, therefore, must not apply to the Fee Increase Statutes. *See Lawson*, 336 U.S. at 201; *Rowland*, 506 U.S. at 200–01. The Court must then look to the "plain meaning" of the words in their "ordinary sense" to determine the meaning of the Fee Increase Statutes. *See Nw. Austin Mun. Util. Dist. No. One*, 557 U.S. at 206; *Sigmon Coal Co.*, 534 U.S. at 450. The plain language suggests "application" can mean "petition," as stated in 8 C.F.R § 1.2, and "admission" can mean "status," as an H-1B nonimmigrant. The Fee Increase Statutory structure also supports USCIS's authority to impose the increased fee on change of status petitions because those petitions are already subject to the fraud fee. Additionally, Congress's minor changes when re-enacting the 2015 Fee Statute suggest Congress was aware of USCIS's implementation, and, as Congress did not change the relevant language, this awareness suggests Congress approved of USCIS's interpretation of applying the fee to change of status petitions. The Court therefore finds the Fee Increase Statutes unambiguously authorize USCIS to collect increased fees from employers filing petitions for change of status on behalf of their nonimmigrant employees already in the United States under another status by looking only within "the borders of the statute."[10] *Great N. Ry. Co.*, 287 U.S. at 154. As such, the Court finds the government "is entitled to judgment as a matter of law" and accordingly grants the government's motion for summary judgment. RCFC 56(a); *see United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1295 (Fed. Cir. 2014).

## V. *Chevron* Step Two

### A. The Fee Increase Statutes are Unambiguous, and *Chevron* Step Two is Not Needed

---

[10] As noted previously, the Supreme Court appears to be moving away from *Chevron*. *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022)*; American Hospital Ass'n v. Becerra*, 142 S. Ct. 1896 (2022)*; Becerra v. Empire Health Found.*, 142 S. Ct. 2354 (2022)*.* As Hickman & Nielson note, "The Justices seem more willing to find clarity using traditional tools of statutory interpretation, thereby avoiding Chevron deference altogether." Kristin E. Hickman & Aaron L. Nielson, *Narrowing Chevron's Domain*, article, 70 DUKE L.J. 931 (2021). If *Chevron* is abandoned, the Court finds USCIS's interpretation is also the best interpretation based on the traditional tools of text, structure, and context.

The parties agree there is no need for step two *Chevron* deference because the Fee Increase Statutes' applicability to this case is unambiguous. *See* Pls.' MSJ Mem. at 14, 19 ("Because the plain language of the statute controls the resolution of this case and sets an unambiguous rule, the Court need not go any further in its analysis."); Def.'s Cross-MSJ at 29 ("The Court ultimately need not address Chevron step two in this case."). The government furthers this point as follows: "[T]he intent of Congress to apply the increased fee to petitions for change of status . . . is revealed through the legislative history, structure, and purpose of the statutes a[t] issue. Thus the Court can answer the question in this case at Chevron step one." *Id.* at 30.

Although the Court applies the two-step *Chevron* framework in determining whether the government violated a statute, if the Court determines at "step one" that Congress has directly spoken to the precise question at issue, the Court's inquiry ends. *See Nat'l Ass'n of Mfrs. v. Dep't of the Treasury*, 10 F.4th 1279, 1284 & -88 (Fed. Cir. 2021). The Court cannot defer to a governmental interpretation that is contrary to the plain statutory language. *See Perez v. Cuccinelli*, 949 F.3d 865, 873 (4th Cir. 2020). Nor does the Court give deference to the government's assertions that a statute is ambiguous. *Wells Fargo Bank, N.A., v. FDIC*, 310 F.3d 202, 205-06 (D.C. Cir. 2002). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Sigmon Coal Co.*, 534 U.S. at 462. As the Court concludes *supra* in Section IV.D the Fee Increase Statutes are unambiguous, the Court need not consider *Chevron* step two and whether USCIS's interpretation is afforded deference.

## B. Whether USCIS's Interpretation is Afforded Deference if the Statute is Ambiguous at *Chevron* Step One

As discussed *supra* in Section V.A, neither party believes the Court needs to consider step two *Chevron* deference because both assert the statute is unambiguous, although each party has a different interpretation. *See* Pls.' MSJ Mem. at 14, 19; Def.'s Cross-MSJ at 29. Based on arguments the statute is unambiguous, neither party included an extensive discussion of *Chevron* step two in their briefings, but the issue was discussed at oral argument. *See* Tr. at 84:16–21, 85:10–11. Alternatively, the government argues if the Court finds the statute is silent and thus the Court defers to the agency under Chevron step two, the agency's interpretation controls, and plaintiffs' claim fails. *See* Def.'s Cross-MSJ at 30-31. When asked about *Chevron* step two, plaintiffs stated it "requires a two-step inquiry." Tr. at 82:24–25. First, plaintiffs argue the Court is "still tied to the statutory text to figure out the range of interpretation that is permitted . . . . So the Court would still have to determine whether the interpretation [the government] ventured is within an acceptable range. If it ventures outside of that acceptable range, it's not reasonable." Tr. at 83:1–8. This first inquiry flows from *Chevron*, which directs courts to ask whether the agency's understanding of the statute is "based on a permissible construction of the statute[,]" or, in other words, if the agency's reading is a "reasonable interpretation." *Chevron*, 467 U.S. at 843. "Even under this deferential standard, . . . 'agencies must operate within the bounds of reasonable interpretation.'" *Michigan v. EPA*, 576 U.S. 743, 751 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 332 (2014)).

Plaintiffs assert the second inquiry asks "whether [the agency] reasoned through the position to show that they are in that acceptable range." Tr. at 83:8–10. As part of *Chevron* step two, agency interpretations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. To determine whether agency action is arbitrary and capricious requires an inquiry into whether the agency "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

### 1. Whether the Government's Interpretation of the Fee Increase Statutes was Reasonable

For the first inquiry, at oral argument, plaintiffs stated to determine "the acceptable range of a reasonable construction, the Court would still need to look at the text and the structure and also reference the definition and, of course, how the program is administered." Tr. at 83:12–16. Plaintiffs' argument against the government's interpretation falling within that range is the same as their argument the Fee Increase Statutes are unambiguous, discussed *supra* in Section IV. *See* Tr. at 83:16–19. The government similarly employs the same argument discussed *supra* in Section IV, arguing "the reasonableness would be for the same reasons USCIS has been applying the statute in the manner that they have already, which is the statute does talk about a fraud fee, and the fraud fee is defined by Congress regarding which petitions it's supposed to apply to." Tr. at 89:14–19.

If, at *Chevron* step one, the statute is found "silent or ambiguous with respect to the specific issue," the Court must consider "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If the legislative delegation to an agency is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

If the statute is ambiguous due to disagreement between the fraud fee "with" the phrase "application for admission," one reasonable interpretation would be to apply the increase whenever the fraud fee applies, as the government contends. The question at step two is whether the interpretation is *reasonable*, not whether it is the best, or the interpretation the Court would have chosen. *See id.* For all the reasons the Fee Increase Statutes unambiguously favor USCIS's interpretation as discussed *supra*, the Court finds USCIS's interpretation reasonable. *See id.*

### 2. Whether the Agency's Reasoning is Sufficient to Warrant *Chevron* Deference

Regarding the second inquiry of the agency's reasoning, plaintiffs argue "the agency engaged in no reasoning whatsoever. The only reasoning they engaged in was that there's silence and, therefore, we have authority, but then they didn't take the next step to justify why they were extending their authority, even presuming there was a range of reasonableness that they had." Tr. at 170:5–10. At oral argument, plaintiffs cited *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017), for the proposition "the Court must still look to see

whether the agency failed to consider important aspects of the problem in its reasoning process to come to the position that it had," as arbitrary and capricious review commands.  Tr. at 170:23–171:1 (plaintiffs' counsel noting the relationship between arbitrary and capricious review and *Chevron* step two reasonableness review).  Plaintiffs argue there was "no [such] reasoning here.  So [the government] ha[s] to fail at *Chevron* step two."  Tr. at 171:1–171:2.

The government disagreed with plaintiffs' contention at oral argument.  In its response, the government stated:  "There is reason . . . .  We have cited 84 Fed. Reg. 62,322."  Tr. at 171:4–5.  The government added "[t]he agency has identified that there was an ambiguity . . . , that [the Fee Increase Statutes] didn't identify the universe of petitions, and [USCIS] said it resolved that by going to the defined fraud fee and applying the increased fee in situations where the fraud fee applied."  Tr. at 171:5–10.  The proposed rule states:

> In 2010 Congress enacted new fees for certain H–1B or L petitioners. *See* Public Law 111–230, sec. 402.  USCIS concluded at that time that the statutory language in section 402 of Public Law 111–230 was ambiguous and required it to interpret the statute and determine the full extent to which the fee would apply.  In particular, the statute referred to the filing fee and fraud prevention and detection fee required to be submitted with an application for admission, but it was otherwise silent regarding petitions for H–1B or L classification or for requests for a change of status or extension of stay for beneficiaries who were already admitted into the United States.  USCIS interpreted the statute's ambiguity to apply the fees to petitions for H–1B or L–1 classification when the fraud fee was otherwise required because the statutory language referred to these fees as being collected in addition to the already extant filing and fraud prevention and detection fees.  USCIS, therefore, implemented these fees as applying only when the fraud fee was otherwise collected, in accordance with section 214(c)(12) of the INA, 8 U.S.C. 1184(c)(12); that is, with respect to petitions for an initial grant of status or requesting a change of employer, but not to extension petitions filed by the same employer on behalf of the same employee.  The Public Law 111–230 fee sunset on September 30, 2015 . . . .

> USCIS again concluded that the language in Public Law 114–113, as in the previous statute, was ambiguous and therefore USCIS had to determine whether the fee applied to all extension petitions by covered employers, or just those for which the fraud fee was also charged (extension of stay with change of employer) . . . .

U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. at 62322–323.

In the notice of proposed rulemaking, USCIS acknowledged an ambiguity, explained how they were resolving the ambiguity, and explained why it resolved the ambiguity the way it did.  *Id.*  Plaintiffs' argument USCIS never explained *why* it chose to interpret the regulation fails because USCIS's explanation of the proposed rulemaking does explain its reasoning.  *Id.* ("USCIS interpreted the statute's ambiguity to apply the fees to petitions for H–1B or L–1

classification when the fraud fee was otherwise required *because the statutory language referred to these fees as being collected in addition to the already extant filing and fraud prevention and detection fees*. USCIS, therefore, implemented these fees as applying only when the fraud fee was otherwise collected . . . that is, with respect to petitions for an initial grant of status or requesting a change of employer.") (emphasis added).

As stated *supra*, the Court does not find the Fee Increase Statutes ambiguous; however, even if the Fee Increase States are ambiguous, the government's interpretation is reasonable because USCIS's interpretation falls within the acceptable range of interpretations, and USCIS sufficiently explained its reasoning. *See Chevron*, 467 U.S. at 844.

## VI.  Whether Plaintiffs' Count I Must be Dismissed for Lack of Subject Matter Jurisdiction

Plaintiffs seek a declaratory judgment with Count I; however, the government argues, "a stand-alone declaration of what the statute requires beyond the Court's resolution of the alleged illegal exaction in this case does not fit within the narrow definition of equitable relief [under 28 U.S.C. § 1491(a)(2)] and must be dismissed as beyond the Court's jurisdiction." Def.'s Cross-MSJ at 15.

Plaintiffs assert the government's argument regarding plaintiffs' request for a declaratory judgment "entrench[es] the Department of Justice in a flat contradiction in this same case." Pls.' Resp. & Reply at 15. Plaintiffs state "[they] specifically tailored their Amended Complaint in Count I to follow the District Court's view that this Court can 'declare' the law in the process of concluding that USCIS violated the Public Laws in collecting enhanced fees from Plaintiffs for their change of status petitions." *Id.* at 16. Plaintiffs note they narrowed their claim "to [only] have th[is] Court 'declare' the meaning and scope of the Public Laws" rather than requesting the Court "enter a declaratory judgment as a form of equitable relief" which plaintiffs "maintain" "this Court lacks jurisdiction to enter." *Id.* at 16 n.6.

As the Court holds against plaintiffs regarding Counts II and III by finding the Fee Increase Statutes allow USCIS to impose the increased fee when employers file change of status petitions, the Court does not reach plaintiffs' Count I for declaratory relief and the question of whether the Court has subject matter jurisdiction.

## VII.  Conclusion

For the foregoing reasons, the Court **DENIES** plaintiffs' motion for summary judgement and **GRANTS** the government's cross-motion for summary judgement. The Clerk is **DIRECTED** to enter judgment accordingly.

      **IT IS SO ORDERED.**

s/ Ryan T. Holte<br>
RYAN T. HOLTE<br>
Judge